UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>              v.<br><br>MICHAEL RUSSO, Assistant Attorney General in Charge, Buffalo Regional Office, in his official capacity; STATE OF NEW YORK; KATHY HOCHUL, Governor of New York, in her official capacity; LETITIA JAMES, Attorney General of New York, in her official capacity,<br><br>       Defendants. | Case No.: 1:26-cv-1283 |

## COMPLAINT

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

### INTRODUCTION

1. For over 200 years, the Supreme Court has repeatedly recognized that states have no authority whatsoever to regulate the Federal Government's operations. *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (The Supremacy Clause "prohibit[s] state laws that either regulat[e] the United States directly or discriminat[e] against the Federal Government"); *Mayo v. United States*, 319 U.S. 441, 445 (1943) (The Supremacy Clause renders "the activities of the Federal Government [] free from regulation by any state."); *Tennessee v. Davis*, 100 U.S. 257, 262–63 (1879); *In re Neagle*, 135 U.S. 1, 75 (1890); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). A state law that directly regulates the Federal Government's operations is unquestionably invalid. *E.g.*, *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026

(enjoining state law attempting to regulate federal law enforcement because states are forbidden "from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree").

2.　　Despite that well-established precedent, New York recently passed bills, which Governor Kathy Hochul signed into law, that purport to do exactly what constitutional law says it cannot: subject federal officers to criminal laws that seek to regulate how those officers carry out their federal duties. Governor Hochul even acknowledged the laws' aim to regulate federal officers, boasting that the laws are designed "to hold ICE accountable."[1]

3.　　On or about May 21, 2026, the New York legislature passed budget bill S. 9005-C, which the Governor signed into law on May 27, 2026 (hereinafter the "Budget Act" or "SB S9005-C"). The Budget Act included provisions that amended New York Civil Rights Law ("N.Y.C.R.") §§ 100–02 and New York Executive Law § 170-k.[2] Such provisions are blatantly unconstitutional.[3]

4.　　N.Y.C.R. §§ 100–02, as amended by the Budget Act, purports to regulate what federal officers may and may not wear within the State of New York when carrying out their official duties, including face coverings and personal identifiers. Specifically, N.Y.C.R. § 101 bans face coverings (hereinafter the "Face Covering Act" or "§ 101") and § 102 requires federal law enforcement officers to identify themselves in specific ways (hereinafter the "Identification Act" or "§ 102"). Violations of those provisions by a federal officer are criminal offenses punishable by

---

[1] Governor Hochul Signs Comprehensive Immigration Plan to Protect New Yorkers Against ICE (May 28, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-comprehensive-immigration-plan-protect-new-yorkers-against-ice (last accessed June 10, 2026).

[2] The United States reserves its rights to challenge at a later date various other provisions of the Budget Act that are unlawful, invalid, or otherwise injure the United States by amendment of this Complaint or by filing separate suit. The United States waives none of its rights as to other provisions of the Budget Act by challenging the provisions challenged herein.

[3] The United States has grave concerns over the constitutionality of other parts of the Budget Act as well and reserves the right to bring additional challenges in the future.

Complaint of the United States　　　　　　- 2 -

jail time. The Face Covering and Identification Acts violate the principles of intergovernmental immunity and the Supremacy Clause of the U.S. Constitution.

5.      The Federal Government, not the State of New York, has the authority to control its own agents and activities. In February, the Ninth Circuit unanimously granted a preliminary injunction against a materially similar California law requiring federal law enforcement officers to "visibly display identification." *California*, 173 F.4th at 1063. Because California's law "expressly applie[d] to federal officers[,]" sought "to control their conduct in performing law enforcement operations," "purport[ed] to override the federal government's power to determine whether, how, and when to publicly identify its officers," and thereby "aim[ed] to regulate the manner and conditions under which federal agents can enforce federal law," the Ninth Circuit easily concluded that it was likely "barred by intergovernmental immunity" under the Supremacy Clause. *Id.* at 1067–68. Moreover, the district court held that California's substantially similar facial covering ban unlawfully regulated and discriminated against the Federal Government and thus granted the government's motion for preliminary injunction. *See United States v. California*, 819 F. Supp. 3d 1109 (C.D. Cal. 2026).

6.      New York's Budget Act seeks to regulate the actions of federal law enforcement officers within New York by subjecting those federal officers to criminal penalties for following the federal laws and policies that govern their federal duties and actions. Such state-imposed laws undermine the principles of federalism that underlie our entire constitutional order by seeking to prevent effective federal law enforcement in New York. Such actions harm the citizens of both the United States as a whole and of New York as a State and are unconstitutional subject to the Supremacy Clause. U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, states have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch*, 17 U.S. at

436; *see also Mayo*, 319 U.S. at 441 ("[T]he activities of the Federal Government are free from regulation by any state."). Dictating how federal agents must operate, where they may operate, and requiring them to be subject to state law when performing their federal duties are blatant violations of intergovernmental immunity.

7.      New York's unconstitutional actions do not stop there. The Budget Act also includes the "Local Cops, Local Crimes Act," which amends New York Executive Law to add § 170-k (hereinafter the "Termination Act" or "§ 170-k"), and requires local governments, law enforcement agencies, state and local correctional facilities, juvenile detention centers, and youth and family services facilities for youth to terminate agreements by August 25, 2026.

8.      New York seeks to override Congress's enactments that provide that the Department of Homeland Security (DHS) may enter into agreements with States and localities in which, at present, U.S. Immigration and Customs Enforcement (ICE) trains local officers in immigration enforcement matters and provides them with the authority to conduct such matters under the color of federal law. 8 U.S.C. § 1357(g) (Immigration and Nationality Act 287(g), hereinafter "287(g) agreements"). New York law enforcement agencies, including at the state and local levels, have entered into valid agreements with ICE over the years pursuant to § 1357(g). Yet, the New York legislature now seeks to void those contracts entirely. The law demanding it is unconstitutional.

9.      The Termination Act violates the Contracts Clause, art. I, § 10, cl. 1, which states "[n]o State shall … pass any … Law impairing the Obligation of Contracts[.]" States cannot pass laws that substantially impair contracts without a legitimate public purpose, *Balt. Teachers Union v. Mayor of Balt.*, 6 F.3d 1012, 1018–19 (4th Cir. 1993), and obstructing federal immigration enforcement is not a legitimate public purpose.

Complaint of the United States                              - 4 -

10.     The Termination Act also violates long-settled principles of preemption embodied by the Supremacy Clause including that a state law may not stand as an obstacle to the accomplishment of a federal objective and may not conflict with a federal law. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). Yet New York's law blatantly conflicts with the federal immigration enforcement laws and seeks to block 287(g) agreements in the State.

11.     The Termination Act further violates the Supremacy Clause's principles that the state cannot regulate or discriminate against the Federal Government. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325 (3d Cir. 2025). New York's law prevents the Federal Government from forming 287(g) agreements with local and state offices, reduces the purposes of 287(g) agreements, and restricts the Federal Government's access to real property.

12.     All of the United States' 287(g) agreements with New York state and local law enforcement entities will be terminated under the Termination Act.

13.     The Termination Act violates the Supremacy Clause and is unconstitutional.

14.     The United States therefore brings this declaratory and injunctive action to enjoin the State of New York and its officers, agents, servants, employees, and attorneys, and those in active concert with them, from enforcing the Face Covering, Identification, and Termination Acts against the Federal Government.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

16.     Venue is proper under 28 U.S.C. §§ 1391(b)(1)–(2) because a state may be sued in any jurisdiction within it, and a substantial part of the events giving rise to the claim occurred, are occurring, or will occur within this district.

17.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

**PARTIES**

18.    Plaintiff, the United States of America, enforces federal laws through its Executive agencies. Those agencies include but are not limited to the Department of Justice and its component law enforcement agencies—*e.g.*, the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA)—and the DHS and its component law enforcement agencies—*e.g.*, ICE (which includes Homeland Security Investigations (HSI)), U.S. Customs and Border Protection (CBP), and the Federal Protective Service.

19.    Defendant Michael Russo is the Assistant Attorney General in Charge for the Buffalo Regional Office of the New York State Attorney General, which covers, *inter alia*, Allegany, Cattaraugus, and Niagara Counties and is sued in his official capacity.

20.    Defendant State of New York is a state of the United States.

21.    Defendant Kathy Hochul is the Governor of New York and is sued in her official capacity. As the Governor of New York, she must "take care that the laws are faithfully executed," which now includes the Face Covering and Identification Acts. NY Const. art. 4 § 3. The Budget Act also amends New York Executive Law by adding § 63-e, which empowers the Governor to enforce and review violations of the Termination Act and pursue civil action. §§ 63-e(3)(b)-(4).

22.    Defendant Letitia James is the Attorney General of New York and is sued in her official capacity. New York Executive Law §§ 63 and 75 empower the New York Attorney General to enforce the laws of the state of New York, and to "[p]rosecute and defend all actions and proceedings in which the state is interested," which now includes criminal violations of the Face Covering and Identification Acts. *Id.* at § 63. Further, the Budget Act amends New York Executive Law to add § 63-e, which empowers the New York Attorney General to appoint the head of the immigrant trust office, and to review and take action against violations of the Termination Act.

## LEGAL AND FACTUAL BACKGROUND

### THE SUPREMACY CLAUSE

23.     The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause incorporates principles of intergovernmental immunity, and thus, a state enactment is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (citation omitted).

24.     The preemption doctrine provides that federal interests trump state interests when federal and state law "clash." *North Dakota v. United States*, 495 U.S. 423, 426 (1990); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477–79 (2018). Preemption is typically categorized as express, field, or conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). Express preemption occurs when Congress includes express language within the statute indicating its preemptive intent. *Id*. at 372. Field preemption occurs when Congress intends federal law to "occupy the field," leaving no room for state law in the area. *Id*. State law is also naturally preempted to the extent of any conflict with a federal statute. *Id*. That includes, for example, if it is impossible to comply with both state and federal law, and where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 372–73.

### THE CONTRACTS CLAUSE

25.     The Contracts Clause restricts the power of States to disrupt contractual arrangements, providing that "[n]o state shall . . . pass any . . . Law impairing the Obligation of

Contracts." U.S. Const., art. I, § 10, cl. 1. The Clause "applies to any kind of contract." *Ashley Sveen v. Melin*, 584 U.S. 811, 818 (2018).

26.     A state law is invalid if it causes substantial contractual impairment without a significant and legitimate public purpose. *Id.* at 819. Moreover, even if a State identifies a significant and legitimate public purpose for its law, it still must show that its law advances that purpose in an appropriate and reasonable way. *Id.*

<strong>FEDERAL LAW ENFORCEMENT</strong>

27.     The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3.

28.     Subordinate officers in various federal agencies assist the President in discharging that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *see also Davis*, 100 U.S. at 263 (stating that the Federal Government "can act only through its officers and agents").

29.     Federal law empowers the Executive to provide for and dictate the conduct of federal law enforcement officers in carrying out their official duties prescribed by Congress. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees[]"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control, direct[], and supervis[e]" all DHS employees).

30.     Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g., id.*; 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to,

as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

31.     Because the authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers and agents "must act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement officers carry out their duties within the several states, including New York.

32.     For example, the DEA enforces our Nation's controlled substances laws. *See generally* The Controlled Substances Act (CSA), *codified as amended at* 21 U.S.C. § 801, *et seq.*

33.     In carrying out that mission, the DEA investigates and aids in the prosecution of major violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.2.[4]

34.     As another example, the FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. It carries out this mission through numerous operations throughout the country and in partnership with federal, state, local, and foreign officials. *See id.* § 0.85.[5]

35.     And as another example, DHS, through ICE and CBP, is principally responsible for enforcing our Nation's immigration laws, including the Immigration and Nationality Act (INA), and, pursuant to Congress's power to "establish an uniform Rule of Naturalization," U.S. Const.

---

[4] *See also* DEA, Mission Statement, https://www.dea.gov/about/mission (last visited June 16, 2026).
[5] *See* FBI, About, Mission and Priorities, https://www.fbi.gov/about/mission (last visited June 9, 2026).

Complaint of the United States                    - 9 -

art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *Arizona v. United States*, 567 U.S. 387, 395 (2012).

36.    The INA confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29(a), 1231. As part of those enforcement efforts, DHS, through HSI, also investigates transnational crime and threats, including incidents of human smuggling and human trafficking. *See* 8 U.S.C. §§ 1324, 1232. The INA permits the Executive Branch to enter into agreements with state and local agencies pursuant to 8 U.S.C. § 1357(g) to permit authorized state and local officers to act as immigration officers under the direction and supervision of the Executive Branch.

37.    Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, and an inherent obligation and broad authority to establish immigration laws, *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

38.    The States cannot obstruct or take discriminatory action against the execution of those laws, *see Arizona*, 567 U.S. at 394–95; *North Dakota*, 495 U.S. at 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring), as only the Federal Government maintains the authority to grant an alien the privilege to enter our Nation and controls the terms and conditions of such privilege, *see Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

39.    Congress exercised its authority to make laws governing the entry, presence, status, and removal of aliens by enacting provisions of the INA, 8 U.S.C. § 1101 *et seq*. The INA also authorizes the Secretary of Homeland Security to "establish such regulations; prescribe such forms

of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]." *Id.* § 1103(a)(3).

40.    Although the Federal Government possesses broad power over immigration, enforcing the immigration laws is a formidable challenge with significant complexities. To meet that challenge, the Federal Government regularly works with state and local governments. Indeed, "[c]onsultation between Federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.

41.    Congress has directed that a Federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1644 (same); *id.* § 1357(g)(10)(A) (providing no agreement is required for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Similarly, Congress mandates that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, maintaining "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

42.    Federal law also contemplates that DHS be able to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to State or local custody pending prosecution. *See id.* §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And 8 U.S.C. § 1357(a)(1) authorizes DHS "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." Any state law or policy that prevents federal

law enforcement from such inspection or interrogation stands as an obstacle to DHS's statutory and regulatory mandate.

43.     Furthermore, cooperative efforts between federal officials and state and local officials are critical to enabling the Federal Government to identify, process for removal, and thereafter remove the hundreds of thousands of aliens who violate immigration laws (and other laws) each year.

44.     Cooperation is also a key component of the decision Congress made to permit states and localities to impose criminal punishment on an alien, and to have an alien serve that punishment, before the alien is removed from the country. *See id.* § 1231(a)(1)(B)(iii) (providing that the removal period does not begin until an alien in state custody is "released from detention or confinement"). Cooperating allows DHS to take into custody aliens convicted of crimes after the completion of their criminal sentence and to detain other aliens pending removal proceedings. *Id.* §§ 1225(b)(2)(A), 1226(c); *see also id.* § 1231. Federal law contemplates and authorizes these cooperative efforts in service of the interests of the Federal Government, states and localities, and the public. Because the Federal Government has a regulatory relationship with all aliens within the United States, its grant of permission to states and localities to pursue their criminal-enforcement interests does not affect the Federal Government's ultimate authority over criminal aliens. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

45.     Federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens." 8 U.S.C. § 1226(d)(1)(A).

Complaint of the United States                - 12 -

46.    Federal officials also must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." *Id.* § 1226(d)(1)(B); *see also id.* §§ 1226(c), 1231(a).

47.    Congress also authorized states and localities to "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

48.    In addition, "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," a "principal example" of which is "when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408–09 (citing *id.* § 1357(g)); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023). Section 1357(g)(1) provides:

> the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

49.    Congress added 287(g) to the Immigration and Nationality Act (codified at 8 U.S.C. § 1357(g)) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104-208, div. C, sec. 113, 110 Stat. 3009, 3009–546 (1996). The bill was designed to "strengthen[ ] the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system—without punishing those living in the United States legally." President William J. Clinton, Statement on Signing the Omnibus Appropriations Act, 1996 U.S.C.C.A.N. 3388, 3391 (Sept. 30, 1996); *see* H.R. Rep. 104-828 (Sept. 24, 1996)

(Conf. Rep.) (describing IIRIRA as a bill "to improve deterrence of illegal immigration to the United States" and "to reform the legal immigration system").

50.　　Pursuant to 287(g) agreements, qualified state and local officers designated by the Secretary of Homeland Security[6] may perform specified immigration-enforcement functions relating to investigating, apprehending, and detaining aliens. 8 U.S.C. § 1357(g)(1)–(9). Section 287(g) requires that the specified officers "have knowledge of, and adhere to, Federal law" relating to immigration enforcement and that they receive "adequate training regarding the enforcement of relevant Federal immigration laws." *Id.* § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409 (citing § 1357(g)(2); 8 CFR § 287.5(c) (arrest power contingent on training), *id*. § 287.1(g) (defining the training)). "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *Alas*, 63 F.4th at 274 (quoting *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009)); *see id*. at 275 (describing 287(g) agreement as "crafted to ensure that each HCSO officer or employee tasked with enforcing Federal immigration law is well-trained, tested, and certified.").

51.　　The Federal Government has been entering into 287(g) agreements with New York law enforcement for many years, with the oldest current agreement in the state dating to 2020.[7]

52.　　DHS has relied on such agreements over the years to assist its immigration enforcement efforts in the State and continues to do so. In 2026 alone, for example, 287(g) agreements in New York have directly resulted in the arrest or safe transfer to ICE custody of

---

[6] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

[7] ICE 287(g) Program Map and 287(g) Program Models, https://ice.gov/identify-and-arrest/287g (last accessed June 10, 2026).

Complaint of the United States　　　　　　- 14 -

illegal aliens charged with rape, arson, assault, and white-collar crimes who otherwise may have been released to the public.

53.    On January 12, 2026, the Oneida Nation Indian Police Department arrested Myat Bhone Khant (Khant) for two counts of Rape in the First Degree, Rape in the Third Degree, and Forcible Touching in Madison County, New York. Khant posted bail; however, because of a Warrant Service Officer 287(g) agreement in place between ICE and the Madison County Sheriff's Office, a local officer with delegated 287(g) authority served an I-200, Warrant for Arrest of Alien on Khant which executed his custodial transfer to ICE. On the same date, Khant was transferred to Orange County Jail where ICE detained him during his removal proceedings. On June 16, 2026, he was issued a final order of removal by the Immigration Judge, following his waiver of appeal.

54.    On May 29, 2026, the Cattaraugus County Sheriff's Department served a series of administrative arrest warrants on several illegal aliens and, pursuant to a Task Force Model 287(g) agreement, transferred these aliens to an ICE facility, one of whom had stabbed another alien.

55.    On May 10, 2026, the Nassau County Police Department arrested Elder Lopez Avalos (Avalos) for Arson in the Third Degree-Intentionally Damage, Arson in the Fourth Degree-Recklessly Damage, Criminal Mischief in the Third Degree-Damage Another's Property, and Arson in the Fifth Degree-Intentionally Damage Property of Another by Fire or Explosion in Nassau County, New York. Arson is not a bail-eligible crime, and Avalos was released on non-monetary conditions. On May 11, 2026, Nassau County 12 Police Officers delegated with Task Force Model 287(g) authority notified ICE that Avalos was at the Nassau County Police Headquarters. ICE generated and issued an I-200, Warrant of Arrest and placed Avalos under arrest.

56.    On June 5, 2026, local officers for the Cattaraugus County Sheriff's Department with delegated 287(g) authority, pursuant to a Task Force Model 287(g) agreement, arrested two

illegal aliens on behalf of ICE who attempted to scam an elderly male out of $50,000 and transferred these aliens to an ICE facility.

57.    As of June 2026, New York has fourteen 287(g) agreements throughout the state across twelve different departments in eleven different counties and municipalities. All the agreements are directly with police or sheriff departments. Those agreements fall into three categories: Task Force, Warrant Service, and Jail Enforcement. Some localities have a combined Warrant Service and Task Force agreement.[8]

58.    Consistent with 8 U.S.C. § 1357(g), state and local partners governed by the Task Force Model agreements are subject to ICE direction and supervision as to immigration enforcement functions. Prior to executing any immigration enforcement functions, officers must be selected, successfully complete training, pass examinations, and be certified and authorized by ICE. The agreements set forth the particular immigration enforcement powers a certified and authorized officer may perform, and specify that those functions can only be performed under ICE's direction. Task Force Officer agreements enable officers to identify and report suspected aliens not charged with crimes (under ICE oversight) and exercise limited immigration authority on ICE-led task forces.

59.    State and local partners governed by the Jail Enforcement Model agreements are nominated, trained, certified, and authorized to identify and process removable aliens who are booked into local jail facilities, subject to ICE supervision and direction. Such officers may, for example, serve and execute warrants for immigration violations or removal, question suspected aliens about their right to remain in the United States, process aliens including fingerprinting,

---

[8] ICE 287(g) Program Map and 287(g) Program Models, https://ice.gov/identify-and-arrest/287g (last accessed June 10, 2026).

photographing, and interviewing them, issue immigration detainers, draft immigration charging documents for ICE review and signature, and transport aliens to ICE detention facilities.

60.     State and local partners governed by the Warrant Service Officer agreements are nominated trained, certified, and authorized to perform limited functions within the local jail including serving warrants for immigration violations or removal, and to detain and transport aliens to an ICE facility at ICE's request.

61.     All 287(g) agreements require specified officers who are trained and authorized by ICE to then work under the direction of ICE when performing immigration-related functions. Any agreement may be terminated by either party on notice. For example,  Broome County's Warrant Service Officer memorandum of understanding requires a 90-day notice of termination; Rensselaer County's Jail Enforcement Model and Allegany County's Task Force Model memoranda of agreement require termination in writing to the local ICE Field Office.

62.     State and local partners who are nominated and selected to participate in one of the model 287(g) programs are trained at ICE expense as to the immigration duties pertinent to the applicable model.

63.     Such cooperation thus occurs under color of federal authority, not state authority: "An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). Section 1357(g)(1) thus grants local officers the powers and immunities of federal immigration officials. *See, e.g.*, [section of MOAs that specify this].

64.    Federal law enforcement officers work throughout the entire country and are subject to the control of the Federal Government, not each individual state or locality. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control, direct[], and supervis[e]" all DHS employees).[9] Likewise, when it comes to liability, federal law enforcement officers are subject to federal law, not state law. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S. 93, 101–02, 111 (2020) (explaining limited nature of *Bivens* and history leading to the Federal Tort Claims Act (FTCA) as the exclusive remedy for most claims against Government employees arising out of their official conduct).

### THE CHALLENGED NEW YORK LAWS

### NEW YORK'S LAW SB 9005-C

65.    The Budget Act sections setting forth the Termination Act and the Face Covering and Identification Acts were fast-tracked through the legislative process.[10] On January 30, 2026, Governor Hochul proposed the original framework of the policies in a press conference.[11] On

---

[9] *See also* 5 U.S.C. § 5901 (directing the head of each Federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of Federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

[10] Keeping New Yorkers Safe: Governor Hochul Introduces the Local Cops, Local Crimes Act to Stop ICE from Co-Opting Local Law Enforcement (Jan. 30, 2026), https://www.governor.ny.gov/news/keeping-new-yorkers-safe-governor-hochul-introduces-local-cops-local-crimes-act-stop-ice-co (last accessed June 11, 2026).

[11] *Id.*

Complaint of the United States                - 18 -

February 9, she hosted a roundtable with law enforcement and elected officials in promotion of the same.[12]

66.     In the weeks that followed, the policies were integrated into budget negotiations.[13] On May 21, both legislative chambers passed the Fiscal Year 2027 budget bill with the relevant provisions included and presented it to Governor Hochul for review. She signed SB 9005-C into law on May 27, 2026. The Face Covering and Identification Acts are set to take effect on June 26, 2026, SB 9005-C subp. F § 3. The relevant portions of the Termination Act are set to take effect on August 25, 2026. *Id.* subp. A §4.

67.     The Face Covering Act generally purports to prevent a law enforcement officer from "wear[ing] any face covering that conceals, disguises, or obscures their facial identity while interacting with the public in the performance of their duties . . ." N.Y.C.R. § 101(1). "Law enforcement officer" includes "any federal law enforcement officer, as defined in section 2.15 of [New York's] criminal procedure law." *Id.* § 100(2)(c). In turn, that section of the New York Criminal Procedure Law specifically includes FBI, ICE, DEA, and CBP officers and agents. N.Y. Crim. P. Law 2.15(1), (3), (5), (7). "Face covering" generally "means any item that is used to conceal, disguise, or obscure the facial identity, including any opaque mask, garment, helmet, headgear, balaclava, ski mask, neck gaiter, or tactical mask." N.Y.C.R. § 100(1).

68.     The "face covering" definition excludes several types of head and facial attire, including religious head coverings, coverings worn for occupational health reasons, and coverings

---

[12] Keeping New Yorkers Safe: Governor Hochul Highlights Growing Support for Local Cops, Local Crimes Act (Feb. 9, 2026), https://www.governor.ny.gov/news/keeping-new-yorkers-safe-governor-hochul-highlights-growing-support-local-cops-local-crimes (last accessed June 11, 2026).

[13] Immigration budget deal within reach as lawmakers pass fourth extender (April 16, 2026), https://www.cityandstateny.com/policy/2026/04/immigration-budget-deal-within-reach-lawmakers-pass-fourth-extender/412911/ (last accessed June 11, 2026).

Complaint of the United States                   - 19 -

used for camouflage. *Id.* Based on the language of the law, it appears that the State of New York solely decides whether and when these exceptions apply.

69.    An individual who willfully violates the Face Covering Act is guilty of a violation for a first offense punishable by up to 15 days in jail, and each subsequent event is a misdemeanor punishable by up to one year in jail. *Id.* § 101(2), N.Y. Penal Law § 70.15.

70.    Additionally, under the Identification Act, "[a]ny uniformed law enforcement officer while interacting with the public in the performance of their duties shall visibly display . . . the name of the agency or department employing such officer; and . . . at least one form of identification of the officer, such as the officer's name, badge number, or shield number." N.Y.C.R. § 102(1). And "[l]aw enforcement officers who are not uniformed while interacting with the public in the performance of their duties shall wear at least one visibly identifying agency-issued or department-issued logo, patch, emblem, insignia, or other external identifier clearly identifying such officer as a law enforcement officer within such agency or department acting under color of law." *Id.* § 102(2).

71.    Section 102's identification requirement does not apply to "officers engaged in active undercover operations, covert surveillance, other investigative activities where identification would compromise such investigation, or protective detail assignments for a designated person or location where visible identification would materially increase a security risk to the officer or the protected individual;" or "officers using personal protective equipment required for medical or emergency response purposes, where such equipment temporarily prevents visible display of identification." *Id.* § 102(3).

72.    "Visibly display" "means to wear externally on the uniform in a size and location that is reasonably visible to members of the public with whom the officer interacts; and . . .

compliance with 10 U.S.C. § 723, in circumstances where that statute applies, satisfies all obligations that this section imposes upon the officer." *Id.* § 102(4).

73.    An individual who willfully violates the Identification Act is guilty of a violation for a first offense punishable by up to fifteen days in jail, and each subsequent offense is a misdemeanor punishable by up to one year in jail. *Id*. § 102(5), N.Y. Penal Law § 70.15.

74.    The Face Covering Act and the Identification Act take effect on June 26, 2026. SB 9005-C subp. F § 3.

75.    Under the Termination Act, state and local correctional and related agencies are no longer allowed to "enter into, modify, renew, remain in, or extend" "any agreement pursuant to section 287(g) of the Immigration and Nationality Act . . ." or "any contract, intergovernmental service agreement, or any other formal or informal agreement to house or detain individuals for federal civil immigration violations, including, but not limited to, agreements entered into pursuant to 8 U.S.C. § 1103(a) or § 1231(g)." N.Y. Exec. Law § 170-k(2)(a). And further, any such agreement "shall be deemed not consistent with state law and any such agreement . . . shall be void and unenforceable," and any state or local correctional or related agency subject to the law is required to "exercise any applicable termination provision contained in such agreement." *Id.* § 170-k(7)(a).

76.    As used in § 170-k(2)(a), "law enforcement agency" refers to "the New York state police and any law enforcement agency or department of any municipality, any police district, or any agency, department, commission, authority or public benefit corporation of the state of New York employing a police officer." *Id.* § 170-k(1)(a).

77.    "Local government" is "any municipal corporation and governing board in the state of New York." *Id.* § 170-k(1)(b).

78.    "Municipal corporation" includes "a county, town, city and village." *Id.* § 170-k(1)(c); N.Y. Gen. Mun. Law § 2.

79.    "Governing board" includes "the board of supervisors of a county, the town board of a town, the common council of a city, and the board of trustees of a village." N.Y. Exec. Law § 170-k(2)(d); N.Y. Gen. Mun. Law § 2.

80.    "Correctional facility" refers to any place operated by the state department of corrections and community supervision and "designated by the commissioner [of corrections and community supervision] as a place for the confinement of persons under sentence of imprisonment or persons committed for failure to pay a fine," but excludes institutions to house mentally ill persons pursuant to a court order. N.Y. Exec. Law § 170-k(2)(e); N.Y. Correct. Law § 2(4)(a)–(b).

81.    "Local correctional facility" means "[a]ny place operated by a county or the city of New York as a place for the confinement of persons duly committed to secure their attendance as witnesses in any criminal case, charged with crime and committed for trial or examination, awaiting the availability of a court, duly committed for any contempt or upon civil process, convicted of any offense and sentenced to imprisonment therein or awaiting transportation under sentence to imprisonment in a correctional facility, or pursuant to any other applicable provisions of law." N.Y. Exec. Law § 170-k(2)(f); N.Y. Correct. Law § 2(16)(a).

82.    "Immigration detention facility" "means any building, facility, or structure used, in whole or in part, to house or detain individuals for any violation of a civil provision of the federal Immigration and Nationality Act relating to an individual's immigration status." N.Y. Exec. Law § 170-k(1)(g).

83.    "Juvenile detention facility" means a specialized secure, secure, or nonsecure detention facility" certified by New York's office of children and family services. *Id.* § 170-k(1)(h).

Complaint of the United States                - 22 -

84.    "Facility for youth placed with or committed to the office of children and family services" means a facility operated for the care custody, treatment, housing, education, rehabilitation and guidance of youth placed with or committed to the office of children and family services. *Id.* § 170-k(1)(i), 504.

85.    "Immigration authority" "means an agency that primarily enforces immigration law" including, ICE or CBP, and "any successor agencies having similar duties; or a federal agency making a request or taking an enforcement action pursuant to the civil enforcement provisions of the federal Immigration and Nationality Act." *Id.* § 170-k(1)(j).

86.    "Immigration enforcement" "means the enforcement of any civil provision of the federal Immigration and Nationality Act for the purpose of determining a person's lawful presence or status in the United States, or for the purpose of apprehending, detaining, transferring, or removing a person solely for civil immigration purposes because of such person's immigration status." *Id.* § 170-k(1)(k), 319(4).

87.    "Immigration law" "means any civil provision of the federal Immigration and Nationality Act and any provision of law that penalizes a person's presence in, entry into, or reentry into the United States." *Id.* § 170-k(1)(l).

88.    The Termination Act is, in pertinent part, set to take effect on August 25, 2026. *Id.* subp. A § 170-k(2)(7)(a).

### THE UNITED STATES HAS STANDING AND IS IRREPARABLY INJURED BY NEW YORK'S LAWS

89.    The United States has standing to bring this lawsuit where it "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [state] statute." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

90.    The Face Covering, Identification, and Termination Acts violate the Supremacy Clause and principles of intergovernmental immunity, and thus impose a sovereign and irreparable injury on the United States. *Cf. Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).

91.    The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to New York (or any state) by complying with New York's purported requirements for federal law enforcement officers or for 287(g) agreements. A favorable ruling would redress these harms.

92.    Even beyond the sovereign injury, which itself is sufficient for standing to seek an injunction, compliance with the challenged New York laws and enforcement of the New York laws against federal officers *would* endanger officers.

93.    The Face Covering, Identification, and Termination Acts would also compromise federal agencies' operational effectiveness, including law enforcement efforts by FBI, DEA, and DHS. Activists in New York have subjected ICE Enforcement and Removal Operations officers to being spit on and having unidentified objects thrown at them while conducting enforcement activities. Wearing facial coverings can minimize exposure to these, and other health hazards. The need to protect Special Agents' identities and association with DEA is not confined to activities which would compromise that particular investigation; rather, the exposure of Special Agents' identities and association with DEA even in an overt DEA operation could enable suspects to identify those agents who become involved in future undercover operations, which would obstruct those future actions. If images of a CBP officer or agent's face become widely distributed, then that officer or agent will be less safe and effective when conducting surveillance, plainclothes operations, or undercover operations.

94.    Federal law enforcement agencies cannot and will not comply with the challenged laws, which are unconstitutional. The Face Covering and Identification Acts recklessly disregard officers' safety, public safety, and federal operational needs.

95.    The Face Covering and Identification Acts harm federal law enforcement. Law enforcement is always a dangerous job but now is an extraordinarily dangerous time to serve in federal law enforcement in particular. Protecting the personal identities of federal officers, and by extension their families, is necessary in part due to the increasing threats of targeted harassment and retaliation against federal officers and agents for simply doing their jobs commanded by Congress. While such threats have always existed, the volatile political environment has increased such threats exponentially, requiring new tactics to mitigate the harms to officer safety and operational effectiveness.

96.    Increasingly, members of the public photograph, film, and publish federal enforcement actions online and include the personal identities of federal officers for the sole purpose of intimidation and harassment. This content is directly used by members of organized crime and transnational criminal organizations in serious and potentially deadly ways.

97.    For example, some individuals photograph officers' faces and run them through facial recognition applications that search social media and doxxing sites such as ICESpy.org, ICEList.is, and ICEList.info. Once a match is made, they often search for family members, including children, and disseminate this information online, allowing people to track, harass, and obstruct law enforcement.

98.    This opens officers up to harassment, tracking, intimidation, and assaults in the performance of their duties in the field. These threats are coming from rioters, illegal aliens, as

well as "highly sophisticated gangs like Tren de Aragua and MS-13, criminal rings, murderers, and rapists."[14]

99.     Facial coverings are a necessity in preventing agitators from identifying and tracking officers, especially those using facial recognition or other tools. And while officers almost always wear tags identifying themselves as federal officers (with the exception of, for example, undercover or plainclothes operations), personal identifiers carry risks that can allow agitators to identify and harass individual officers in their official and personal capacities. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal histories and affiliations with gangs, transnational criminal organizations, and known or suspected terrorists.

100.    Facial coverings and removal of personal identifiers also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, flexibility is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. The existence of databases with individual officers' identities can also undermine undercover operations and plainclothes missions.

101.    Due to the nature of law enforcement operations, officers require flexibility to determine when to announce their identities. To this end, CBP and ICE have discretion on when they permit their officers and agents to wear facial coverings and remove individual identifiers. They also allow officers discretion as to when they announce themselves. Federal regulations

---

[14] Press Release, DHS, 8000% Increase in Death Threats Against ICE Law Enforcement as They Risk Their Lives to Remove the Worst of the Worst (Oct. 30, 2025), https://www.dhs.gov/news/2025/10/30/8000-increase-death-threats-against-ice-law-enforcement-they-risk-their-lives (last accessed June 16, 2026).

Complaint of the United States          - 26 -

provide that "an immigration officer who is authorized to execute an arrest" shall announce themselves and the purpose of the arrest "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii). That is up to each officer depending on the facts and circumstances of each particular case and cannot be subjected to bright-line or conflicting rules. Removing this flexibility would undermine officer safety and operational effectiveness.

102.    Denying federal agencies and officers discretion in these areas would chill federal law enforcement and deter applicants for law enforcement positions, obstructing safety of communities in New York.

103.    The threat of state enforcement for noncompliance will only further exacerbate the chilling effects of these laws. Many federal officers choose to wear masks and have done so prior to the passage of the challenged law. Officers face a choice of whether to wear facial coverings or identify themselves when it may be dangerous to themselves, others, and the operation, or face the threat of criminal enforcement. Either option presents serious risks and harms and purposefully works to chill the enforcement of federal law. *Davis*, 100 U.S. at 262–63 (1879); *In re Neagle*, 135 U.S. at 75. Given the personal threats and violence that agents face, federal law enforcement agencies may allow their officers to wear masks to protect their identities and provide an extra layer of security.

104.    By imposing state-created laws regarding facial coverings and identification upon federal law enforcement, especially when federal law enforcement personnel use and require discretion for how they carry out federal law enforcement activities, New York makes communities less safe by making federal enforcement more dangerous. Officers and agents express concerns about being doxxed when performing their assigned duties and worry about their personal safety and the safety of their families. Internet access to a Special Agent's PII poses a real threat that third

parties will access the information, engage in data mining, identity theft, and other crimes, and seek to inflict violence on the Special Agent or his or her family in retaliation for the Special Agent's participation in an investigation or operation. Permitting officers and agents to cover their faces or remove visible identifying information from their uniforms helps to reduce the risk of doxxing by limiting the ability of facial recognition technology to identify the officer or agent and by reducing the likelihood that the officer or agent's full name and other identifying information will be discovered by those seeking to dox federal personnel.

105.    By terminating active and ongoing 287(g) agreements, New York via the Termination Act is actively thwarting cooperation between the Federal Government and state and local entities to remove illegal immigrants from the country and exposing American citizens in the state of New York to greater risk of being victims of crime. *See also Raines*, 362 U.S. at 27. By selectively eliminating those 287(g) agreements, the Termination Act conflicts with and stands as an obstacle to the cooperation envisioned by Congress through the INA, including the provisions of 8 U.S.C. § 1357(g).

106.    The Termination Act invalidates ongoing valid contracts, removing personnel from the supervision of the United States and reducing operational effectiveness, and further putting officer safety at risk. The effort and expense that ICE goes through to train local partners would be rendered ineffective as those same local partners would no longer cooperate with ICE pursuant to 287(g) agreements currently in effect. In turn, criminal alien transfers that could otherwise have occurred in the detention facilities or other secure areas between local partners and federal law enforcement, will now have to occur in the community. These at-large arrests involve greater risk to the officers and require more resources, planning, and a greater number of ICE officers in the field.

107.    There is no adequate remedy at law.

108.    The public interest favors maintaining our system of federalism and the Constitutional lines drawn between Federal and State power and enabling the Federal Government to carry out its functions as mandated by the Constitution and Congress.

109.    The harms to the United States alleged herein would be redressed by this Court's judgment that the New York laws are invalid, unconstitutional, and unenforceable, and an injunction preventing the enforcement of the laws.

## NEW YORK'S LAW SB 9005-C VIOLATES PRINCIPLES OF INTERGOVERNMENTAL IMMUNITY

110.    The Face Covering, Identification, and Termination Acts violate principles of intergovernmental immunity because they seek to regulate and discriminate against the Federal Government.

### The Face Covering, Identification, and Termination Acts Unlawfully Regulate the Federal Government

111.    The Face Covering and Identification Acts regulate the Federal Government by dictating the manner in which federal law enforcement officers carry out their operations. This includes dictating what federal law enforcement agents must wear (i.e., identifiers) and what they cannot wear (i.e., face coverings)—both of which affect the ability of each officer to do his or her job. The regulation of federal law enforcement is exclusively the function of the Federal Government, and §§ 100–02 run afoul of that principle on their face.

112.    The Termination Act also seeks to directly regulate the Federal Government by controlling—indeed eliminating from eligibility—the potential entities with whom the Federal Government may form voluntary 287(g) agreements to perform the core government function of enforcing civil immigration law. *See CoreCivic*, 145 F.4th at 319 (state "law with the 'intent' to forbid new contracts for civil immigration detention" was considered unlawful regulation of the

Complaint of the United States                    - 29 -

Federal Government because it "interfere[d] with the federal government's core power to enforce immigration laws."); *see also Geo Group*, 50 F.4th at 757 (state law that "would give California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice" deemed impermissible regulation of the Federal Government).

113.    While federal law authorizes the formation of agreements with state and local entities to assist in the enforcement of federal immigration law, the State of New York seeks to limit and narrow the entities available to assist the Federal Government with the enforcement of federal immigration law. This is unconstitutional.

> Unlike a broad-based tax or workplace-safety rule, this law altogether bans a type of contract, and it does so in a market that exclusively serves a federal power. The Founding generation "surely ... did not intend" for federal operations and the exercise of federal powers to "depend upon the discretion of the state governments." Although the reach of intergovernmental immunity has fluctuated over time, that core principle has remained steady from *McCulloch* to the present day.

*CoreCivic*, 145 F.4th at 328 (quoting *McCulloch*, 17 U.S. at 362).

114.    Section 107-k removes local government, law enforcement agencies, correctional facilities, local correctional facilities, juvenile detention facilities, or facilities for youth in case of the office of children or family services, and any agents of those groups from the pool of entities with whom the Federal Government may form cooperative agreements. *See CoreCivic*, 145 F.4th at 325 ("The law prevents the federal government from choosing how and through whom it will carry out a core federal function."). The elimination of potential parties to agreements that Congress specifically authorized and contemplated as part of the cooperative civil immigration enforcement scheme amounts to regulation of the Federal Government, as it imposes conditions upon the Federal Government (i.e., limits and controls the state and local entities with which the Federal Government may contract) that are inconsistent with federal immigration law and

Congressional intent. *See id.* ("Only the federal government has the power to decide whether, how, and why to hold aliens for violating immigration law. It alone has the power to make these contracts in the first place."). Congress did not enact a law that stated, "the Federal Government may contract with state and local governments to enforce federal immigration law, except state and local governments within New York." By attempting to add this limitation to federal law, the State of New York seeks to regulate the Federal Government in a manner that conflicts with express congressional intent, which does not limit the Federal Government in this respect. *See id.* at 326 ("this ban is in substance a direct regulation; it destroys the federal government's marketplace."); *id.* ("it directly regulates the federal government by telling it how to carry out a core function. It is a direct regulation in everything but name."); *see also id.* at 327 ("the law directly regulates the federal government twice over by substantially interfering with its operations.").

**The Termination Act Discriminates Against the Federal Government**

115.   The Federal Government is the sole entity that is tasked with the enforcement of federal immigration law. Among the enforcement mechanisms authorized by Congress are the formation of cooperative agreements between state and local entities and the Federal Government concerning the enforcement of immigration law. By requiring the immediate termination of these agreements and barring all future agreements while allowing agreements of other kinds between governmental entities to achieve other goals, the Termination Act unlawfully discriminates against the Federal Government.

116.   New York otherwise allows municipal corporations and districts to enter into various sorts of agreements with other entities within and outside of New York State, including for the provision of police protection. *See, e.g.*, General Municipal Law §§ 119-n(c), 119-o. New York law otherwise allows cooperation between different governmental and corporate entities. Only the Federal Government, however, is singled out for unfavorable treatment by the Termination Act.

Complaint of the United States                    - 31 -

That violates the intergovernmental immunity doctrine. *California*, 819 F. Supp. 3d at 1130-32.

## THE TERMINATION ACT VIOLATES THE CONTRACTS CLAUSE

117.    Although "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts," U.S. Const., art. I, §10, cl. 1, New York's new Executive Law § 170-k under the Budget Act unabashedly seeks not just to impair but to terminate 287(g) agreements that are actively existing and ongoing between the Federal Government and state and local entities in New York.

118.    The Termination Act bans local governments, law enforcement agencies, correctional facilities, or detention facilities from entering into, "modify[ing], renew[ing], remain[ing] in, or extend[ing] . . . . any agreement pursuant to section 287(g) of the Immigration and Nationality Act." New York Executive Law § 170-k(2)(a). The ban also prevents any of those agencies from entering "any formal or informal agreement under which an officer or employee may engage in or assist immigration enforcement." *Id.* Likewise, agencies and their officers cannot "detain individuals for federal civil immigration violations." *Id.*

119.    The Termination Act only allows 287(g) agreements with hospitals or social services, but no such agreements appear to exist in New York.[15]

120.    While the Termination Act claims to allow 287(g) agreements for the "provision of detention space for individuals subject to pending federal criminal charges," the law does not allow any agreement to "provide for detention space to house or detain individuals solely for federal civil immigration violations," and U.S. immigration law does not make such a distinction or limitation for 287(g) agreements. *Compare* New York Executive Law § 170-k(2)(b)(iii) *with* 8 U.S.C. § 1357(g).

---

[15] *Compare* New York Executive Law § 170-k(2)(b) *with* ICE 287(g) Program Map and 287(g) Program Models, https://ice.gov/identify-and-arrest/287g (last visited June 10, 2026).

Complaint of the United States                    - 32 -

121.    In purpose and effect, the Termination Act is a ban on all existing and future 287(g) agreements for any type of immigration enforcement in New York. The Act will void all 287(g) agreements under the Task Force Model, Jail Enforcement Model, and Warrant Service Officer Model. That means seven Task Force memoranda of agreement, six Warrant Service Officer memoranda of agreement, and one Jail Enforcement memorandum of agreement will be terminated if the Termination Act is not enjoined.

122.    The Contracts Clause "applies to any kind of contract," and a state law is invalid if it causes substantial contractual impairment without a significant and legitimate public purpose. *Sveen*, 584 U.S. at 818–19.

123.    Obstructing federal law enforcement or federal immigration enforcement is not a legitimate public purpose. 287(g) agreements are authorized by federal law. *See* 8 U.S.C. § 1357(g). Such agreements have existed without issue for decades. For law enforcement entities, the agreements are voluntary. There is no significant and legitimate public purpose behind suddenly terminating and banning longstanding, ongoing, and active 287(g) agreements that local law enforcement agencies voluntarily entered with federal immigration authorities. Neither is there a significant or legitimate purpose for New York to attempt to restrict 287(g) agreements to exclusively function for criminal enforcement (N.Y. Exec. Law § 170-k(2)(b)(iii)), when Congress did not set such a limitation for 287(g) agreements in the INA. *Id.* § 1357(g). Instead, Congress authorized agreements for local law enforcement officers "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers)." *Id.* § 1357(g)(1).

124.    Moreover, even if a State identifies a significant and legitimate public purpose for its law, it still must show that its law advances that purpose in an appropriate and reasonable way. *Sveen*, 584 U.S. at 819.

125.    New York cannot claim state funding as a basis for a legitimate public purpose because while New York does provide some police funding to some counties, towns, and cities, most funding comes from local taxes or bond programs.[16]

126.    If localities or local law enforcement agencies have resource concerns or policy concerns or their constituents do not approve the arrangement, they do not have to enter the agreements. However, there is no significant or legitimate public purpose in passing a law that essentially bans all future 287(g) agreements for the entire State of New York even for local law enforcement agencies that wish to enter into them.

127.    Thus, the only basis for New York to ban all existing 287(g) agreements is because of disagreements with the Federal Government's immigration policies. Immigration, however, is a purely federal function. Those state-based disagreements are not a basis to void preexisting 287(g) agreements with local agencies or to obstruct a congressional scheme. Under the principles of federalism that undergird our country and constitutional order, federal agents enforcing federal law in New York are not beholden to state law, and there can be no significant or legitimate public purpose in undermining federal law or federal immigration enforcement.

128.    Therefore, the Termination Act is not a legitimate exercise of State power. The United States is irreparably harmed by laws that seek to void contracts with federal agencies in

---

[16] *See e.g. DiNapoli Releases Budget Review for City of Buffalo*, New York State Comptroller (May 8, 2028),  https://www.osc.ny.gov/press/releases/2026/05/dinapoli-releases-budget-review-city-buffalo (showing that the City of Buffalo receives revenue from non-recurring revenue, along with real property taxes, sales taxes, and some state aid; local tax revenue totals $353.3 million and state aid totals $161.3 million).

Complaint of the United States                    - 34 -

violation of the Contracts Clause. The Termination Act is unconstitutional and unenforceable, and the harm can be redressed by an injunction preventing the enforcement of § 170-k.

## THE TERMINATION ACT IS PREEMPTED

129.    The Termination Act is preempted by the INA because it conflicts with federal immigration law and stands as an obstacle to the achievement of Congress's immigration goals and objectives. The Act polices how federal law enforcement agencies are to do their jobs and impedes access to property and cooperation with local law enforcement necessary to enforce federal immigration law. "Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 752 (9th Cir. 2022). Consequently, the law is preempted by federal law in numerous respects.

130.    The Termination Act prevents the Federal Government from entering into agreements with local entities to facilitate the detention of aliens and the enforcement of federal immigration law and requires termination of all current agreements. *See* New York Executive Law §§ 170-k(2)(a), (7)(a). As explained *supra* ¶¶ 34-50, Congress created a comprehensive immigration system that contemplated cooperation between the Federal Government and states and localities to ensure uniform enforcement of federal law. *See* 8 U.S.C. § 1357(g). Congress also authorized the formation of agreements with localities to facilitate the detention of violators of civil immigration law. *See id.* §§ 1103(a)(11)(B), 1231(g). While states and localities are permitted to choose to work with federal immigration enforcement authorities under this scheme, states are not permitted to hamper federal immigration enforcement efforts, including efforts to accomplish Congress's comprehensive detention goals. *See generally, e.g.*, *id.* §§ 1231(a)(2)(A), (g); 1226(a)(1), (b), (c).

131.    Part of Congress's immigration enforcement scheme envisioned the formation of 287(g) agreements so that state and local officers could assist with national immigration

enforcement initiatives under the direction of the Federal Government. Such assistance includes transferring detainees, serving warrants, determining immigration status, or working as part of a task force. *See id.* § 1357(g). Indeed, that model was discussed in *Arizona*, in which the Supreme Court rejected the State of Arizona's attempt to alter the federal immigration scheme by providing greater immigration enforcement authorities to its officers than Congress envisioned, without federal oversight. The Court explained that "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer" and one such circumstance is when "the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408 (citing § 1357(g)).

132.    Despite Congress's comprehensive federal immigration enforcement scheme and stated intent that states and localities have the ability to enter into such agreements, § 170-k does not permit any agreements to facilitate immigration enforcement, whether currently existing or existing in the future. The Termination Act thus poses an obstacle to the goals and objectives of federal law by preventing cooperation between localities and the Federal Government that are specifically contemplated by Congress. *See* 8 U.S.C. § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409.

133.    Congress wanted local law enforcement agencies to voluntarily cooperate with DHS in the enforcement of immigration laws through 287(g) agreements. By terminating the fourteen existing agreements with local agencies and preventing future ones, New York has made it impossible to deputize local law enforcement officers to help enforce federal law in their communities where they are most trusted. This adds a significant strain on federal resources and the ability to enforce federal law while effectively destroying Congress's cooperative scheme.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF THE SUPREMACY CLAUSE
### (SECTIONS 100-02—UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

134.     Plaintiff hereby incorporates paragraphs 1 through 133 of the Complaint as if fully stated herein.

135.     New York's enforcement of N.Y.C.R. § 100–02 against law enforcement officers from federal agencies constitutes unlawful regulation of the Federal Government.

136.     Section 101 purports to ban federal agents from wearing facial coverings while performing their duties in New York and subjects those agents to state enforcement for noncompliance, including criminal penalties.

137.     Section 102 purports to require federal agents to display visible identification while performing their duties in New York and subjects those agents to state enforcement for noncompliance, including criminal penalties.

138.     Sections 100–02 therefore purport to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine.

139.     Accordingly, Sections 100–02 as amended by New York's Budget Act SB S9005-C are invalid under the Supremacy Clause, and their application to the Federal Government should be enjoined.

### COUNT II

### VIOLATION OF THE SUPREMACY CLAUSE - INTERGOVERNMENTAL IMMUNITY
### (SECTION 170-K—UNLAWFUL REGULATION OF FEDERAL GOVERNMENT)

140.     Plaintiff hereby incorporates paragraphs 1 through 133 of the Complaint as if fully stated herein.

Complaint of the United States                    - 37 -

141.    New York Executive Law § 170-k as contained in the New York Budget Act SB S9005-C unlawfully regulates the Federal Government by terminating and banning existing 287(g) agreements.

142.    New York therefore purports to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine, rendering New York Executive Law § 170-k invalid under the Supremacy Clause. Section 170-k should be enjoined.

## COUNT III

### VIOLATION OF THE SUPREMACY CLAUSE - INTERGOVERNMENTAL IMMUNITY
### (SECTION 170-K—UNLAWFUL DISCIMINATION AGAINST FEDERAL GOVERNMENT)

143.    Plaintiff hereby incorporates paragraphs 1 through 133 of the Complaint as if fully stated herein.

144.    New York unlawfully discriminates against the Federal Government through New York Executive Law § 170-k within the Budget Act SB S9005-C by singling the Federal Government out expressly and impliedly for termination of 287(g) agreements when other law enforcement agencies who enter into agreements with New York are not so treated.

145.    Accordingly, New York Executive Law § 170-k violates the Supremacy Clause and principles of intergovernmental immunity, is invalid, and should be enjoined.

## COUNT IV

### VIOLATION OF THE CONTRACTS CLAUSE
### (SECTION 170-K—UNLAWFUL IMPAIRMENT OF FEDERAL GOVERNMENT CONTRACTS)

146.    Plaintiff hereby incorporates paragraphs 1 through 133 of the Complaint as if fully stated herein.

147.     The Contracts Clause of the U.S. Constitution provides that, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1.

148.     New York Executive Law § 170-k substantially impairs existing 287(g) agreements between entities in New York and the Federal Government by banning and terminating all such existing and future agreements.

149.     There is no significant and legitimate public purpose behind terminating agreements entered into voluntarily and pursuant to Federal law.

150.     New York Executive Law § 170-k as amended by the Budget Act SB S9005-C is not a legitimate exercise of State power.

151.     Accordingly, Section 170-k is invalid under the Contracts Clause and should be enjoined.

## COUNT V

### VIOLATION OF THE SUPREMACY CLAUSE – OBSTACLE PREEMPTION (SECTION 170-K UNLAWFUL OBSTACLE TO FEDERAL GOVERNMENT)

152.     Plaintiff hereby incorporates paragraphs 1 through 133 of the Complaint as if fully stated herein.

153.     New York unlawfully created an obstacle against the Federal Government through New York Executive Law § 170-k within the Budget Act SB S9005-C by terminating all 287(g) agreements to the direct detriment of federal immigration enforcement efforts, obstructing the accomplishment of federal objectives.

154.     Accordingly, New York Executive Law § 170-k violates the Supremacy Clause and principles of intergovernmental immunity, is invalid, and should be enjoined.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

Complaint of the United States                   - 39 -

A.      That this Court enter a judgment declaring that sections of the Budget Act SB S9005-C amending N.Y.C.R. §§ 100-02 and New York Executive Law § 170-k violate the Supremacy Clause and are therefore invalid as to federal agencies and officers;

B.      That this Court preliminarily and permanently enjoin Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing N.Y.C.R. §§ 100-02 and New York Executive Law § 170-k, as amended by the Budget Act, against federal agencies and officers;

C.      That this Court award the United States its costs and fees in this action; and

D.      That this Court award any other relief it deems just and proper.

DATED:      June 22, 2026

                                   STANLEY E. WOODWARD, JR.
                                   Associate Attorney General

                                   BRETT A. SHUMATE
                                   Assistant Attorney General
                                   Civil Division

                                   SEAN SKEDZIELEWSKI
                                   Counsel to the Assistant Attorney General

                    By:

                    s/   Brandon D. Neuman
                         BRANDON D. NEUMAN (CA Bar No. 319067)
                         LUKE A. MILLER (MN Bar No. 0504247)
                         Trial Attorneys
                         U.S. Department of Justice Civil Division
                         Enforcement & Affirmative Litigation Branch
                         P.O. Box 386
                         Washington, DC 20044
                         (202) 227-7416
                         Brandon.Neuman@usdoj.gov
                         Luke.Miller2@usdoj.gov